UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | |
|---|---|
| JANE DOE (A.L.G.), AN INDIVIDUAL,<br>*Plaintiff*<br><br>v.<br><br>WYNDHAM HOTELS & RESORTS, INC.,<br>WYNDHAM HOTEL GROUP, L.L.C.,<br>TRAVELODGE HOTELS, INC.,<br>KRUPARU HOLDINGS, L.P., and<br>KRUPARU INVESTMENTS, L.L.C.<br><br>*Defendants* | Civil Action No.: |

## PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW Plaintiff Jane Doe (A.L.G.), by and through the undersigned counsel, and respectfully submits her complaint for damages and makes the following averments.

## SUMMARY

1.      Jane Doe (A.L.G.) files this civil lawsuit seeking compensation for the harm she suffered as a result of the sex trafficking she endured in a hotel owned, operated, maintained, and controlled by Defendants and their agents and employees.

2.      Sex trafficking is the recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting of a person for the purpose of causing the person to engage in a commercial sex act either (1) before the person turns 18 years old; or (2) through force, fraud, or coercion.[1]

---

[1] 18 U.S.C. §1591; 22 U.S.C. § 7102.

3.      Commercial sex act means any sex act, on account of which anything of value is given to or received by any person.[2] Traffickers or 'pimps' use threats, violence, manipulation, lies, debt, bondage, and other forms of coercion to compel adults and children to engage in commercial sex acts against their will.

4.      Sex trafficking has become a public health crisis that has reached epidemic proportions in the United States. It is now widely recognized, including by Congress and many state legislatures, that combating sex trafficking requires more than just criminal penalties for pimps and sex buyers.

5.      Since 2003, federal law, through the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. §1581, et seq, has provided victims of sex trafficking a civil remedy against perpetrators of criminal sex trafficking.

6.      In 2008, Congress recognized the need to extend liability beyond sex buyers and sellers and intentionally expanded the scope of the TVPRA to reach those who—while not criminally liable under the TVPRA—financially benefit from participation in a venture that they know or *should know* engages in criminal sex trafficking.

7.      As discussed herein, Defendants derived financial benefit from facilitating sex trafficking by providing venues where traffickers could exploit victims, including victims like Jane Doe (A.L.G.), with minimal risk of detection or interruption.

8.      Defendants continued supporting traffickers, including Jane Doe (A.L.G.)'s trafficker, despite evident and apparent signs of widespread and ongoing sex trafficking at its hotels and specifically at the Travelodge located at 6200 Middle Fiskville Road., Austin, Texas

---

[2] 18 U.S.C. §1591(e)(3).

78752. Defendants were, therefore, knowingly receiving a benefit from participation in a venture that Defendants knew or should have known was engaged in sex trafficking.

## PARTIES

9.     Jane Doe (A.L.G.) is a natural person who is currently a resident and citizen of Florida.

10.    Defendant Wyndham Hotels & Resorts, Inc. is a Delaware corporation with its principal place of business in New Jersey. It can be served by its registered agent Corporate Creations Network Inc., 1521 Concord Pike, Suite 201, Wilmington, DE 19803. Wyndham Hotels & Resorts, Inc. is the successor entity to Wyndham Worldwide Corporation. It retains successor liability for wrongful acts of its predecessor Wyndham Worldwide Corporation. All references to Wyndham in this Complaint include references to the acts and omissions of its predecessor.

11.    Defendant Wyndham Hotel Group, LLC is a Delaware company with its principal place of business in Parsippany, New Jersey. It can be served by its registered agent Corporate Creations Network Inc., 1521 Concord Pike, Suite 201, Wilmington, DE 19803. Upon information and belief, Wyndham Hotel Group, LLC is a wholly owned subsidiary of Wyndham Hotels & Resorts, Inc., and a former subsidiary of Wyndham Worldwide Corporation.

12.    Defendant Travelodge Hotels, Inc. is a for-profit Delaware corporation with its principal place of business in Parsippany, New Jersey. It may be served through its registered agent Corporate Creations Network Inc, 5444 Westheimer #1000, Houston, Texas 77056.

13.    Defendants Wyndham Hotels & Resorts, LLC, Wyndham Hotels & Resorts, Inc., Wyndham Hotel Group, LLC, and Travelodge Hotels, Inc. will be referred to collectively as "Wyndham," "Wyndham Defendants," or "Franchisors." Upon information and belief, they

owned, operated, controlled, and/or managed the Travelodge located at 6200 Middle Fiskville Rd., Austin, Texas 78752.

14.    Defendant Kruparu Holdings, LP is a Texas company doing business in Texas. The address on file for its registered agent, Wainesh Dasai, is not a valid address. Therefore, Kruparu Holdings, LP may be served through the Secretary of State by certified mail at <u>Service of Process, Secretary of State, P.O. Box 12079, Austin, Texas 78711</u>. Upon information and belief, it owned, operated, controlled, and/or managed the Travelodge located at 6200 Middle Fiskville Rd., Austin, Texas 78752.

15.    Defendant Kruparu Investments, LLC is a Texas company doing business in Texas. The address on file for its registered agent, Nainesh Desai, is not a valid address. Therefore, Kruparu Investments, LLC may be served through the Secretary of State by certified mail at <u>Service of Process, Secretary of State, P.O. Box 12079, Austin, Texas 78711</u>. Upon information and belief, it owned, operated, controlled, and/or managed the Travelodge located at 6200 Middle Fiskville Rd., Austin, Texas 78752.

16.    Defendants Kruparu Holdings, LP and Kruparu Investments, LLC will be referred to collectively as "Franchisee Defendants."

## JURISDICTION AND VENUE

17.    This Court has original jurisdiction pursuant to 28 U.S.C. § 1331 because this action involves a federal question under the TVPRA.

18.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) because, pursuant to 28 U.S.C. §§ 1391(c)(2) and 1391(d), at least one Defendant is a resident of the Western District of Texas, and all Defendants are residents of Texas.

19.     Venue is also proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in the Western District of Texas.

20.     A.L.G. was trafficked in this District and Division.

## FACTS

**I.     Jane Doe (A.L.G.) was a Victim of Unlawful Sex Trafficking at a Hotels Owned, Operated, Managed, and Controlled by Defendants.**

21.     Jane Doe (A.L.G.)'s trafficking began in 2013. She had multiple traffickers in the years she was trafficked. Her traffickers controlled her through physical violence and force, posted ads of her, and made her engage in commercial sex acts for their financial benefit. A.L.G. was rescued from the life in 2017 with the help of a hotel security officer and police officers.

22.     In March of 2014, Jane Doe (A.L.G.) was trafficked at the Travelodge located at 6200 Middle Fiskville Road., Austin, Texas 78752 (the "Travelodge").

23.     Jane Doe (A.L.G.)'s trafficking had profound effects on her, consistent with "red flags" of trafficking that are well-recognized in the hospitality industry.[3] These effects were obvious and apparent to the staff and management of the Travelodge Hotel including effects on A.L.G.'s appearance, demeanor, movements throughout the hotel, and her interactions with her traffickers, hotel staff, and others. Observing these effects provided Defendants with notice that A.L.G.  was being continually subjected to coercion, control, and exploitation.

24.     Jane Doe (A.L.G.) remained under the continuous control of her traffickers through at least 2017.

**II.     The Hotel Industry's Role in Sex Trafficking and Defendants' Knowledge of the Problem.**

---

[3] *See supra* section II and accompanying footnote for discussion of "red flags" of trafficking.

25.     The widely known and pervasive relationship between sex trafficking and the hotel industry necessarily shapes what the Franchisor Defendants and Franchisee Defendants knew or should have known regarding the trafficking at their hotel properties, including the trafficking of Jane Doe (A.L.G.).

26.     Today, sex slavery is pervasive in the United States, and hotels are the primary place where it happens.[4] For years, sex traffickers have been able to reap their profits with little risk when attempting to operate within hotels.[5] In 2014, 92% of calls received by the National Human Trafficking Hotline involved reports of sex trafficking taking place at hotels.[6] Hotels have been found to account for over 90% of commercial exploitation of children.[7]

27.     Because of this link between hotels and sex trafficking, government agencies and non-profits have devoted significant efforts to educating the hotel industry, including Defendants, on best practices for identifying and responding to sex trafficking.

28.     Multiple agencies and organizations who actively combat sex trafficking, including the United States Department of Homeland Security, the National Center for Missing and Exploited Children, the Polaris Project, the Texas Attorney General, Love 146, and EPCAT,

---

[4] "This is not only a dominant issue, it's an epidemic issue." *See* Jaclyn Galucci, *Human Trafficking is an Epidemic in the U.S. It's Also Big Business*, Fortune (April 2019),https://fortune.com/2019/04/14/human-sex-trafficking-us-slavery/ (citing Cindy McCain, who chairs the McCain Institute's Human Trafficking Advisory Council). "It's also something that is hiding in plain sight. It's everywhere—it's absolutely everywhere." *Id.*

[5] *See Human Trafficking in the Hotel Industry*, Polaris Project (Feb. 10, 2016), https://polarisproject.org/blog/2016/02/10/human-trafficking-hotel-industry; *see also* Eleanor Goldberg, *You Could Help Save A Trafficking Victim's Life With Your Hotel Room Pic*, Huffington Post (June 2016), http://www.huffingtonpost.com/entry/taking-a-photo-of-your-hotel-room-could-help-save-a-trafficking-victimslife_us_57714091e4b0f168323a1ed7.

[6] Michele Sarkisian, *Adopting the Code: Human Trafficking and the Hotel Industry*, Cornell Hotel Report (Oct. 2015), https://scholarship.sha.cornell.edu/cgi/viewcontent.cgi?article=1222&context=chrpubs.

[7] *See* Erika R. George and Scarlet R. Smith, *In Good Company: How Corporate Social Responsibility Can Protect Rights and Aid Efforts to End Child Sex Trafficking and Modern Slavery*, 46 N.Y.U. J. Int'l L. & Pol. 55, 66-67 (2013).

among others, have established recommended policies and procedures for recognizing the signs of sex trafficking.[8]

29.    Some of the recommended policies and procedures intended to reduce or eliminate sex trafficking, which Defendants are aware or should be aware of, include learning to identify warning signs and indicators of sex trafficking, including but not limited to:[9]

- Individuals show signs of fear, anxiety, tension, submission, and/or nervousness;

- Individuals show signs of physical abuse, restraint, and/or confinement;

- Individuals exhibit evidence of verbal threats, emotional abuse, and/or being treated in a demeaning way;

- Individuals show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, and/or unusual behavior;

- Individuals lack freedom of movement or are constantly monitored;

- Individuals avoid eye contact and interaction with others;

- Individuals have no control over or possession of money or ID;

- Individuals dress inappropriately for their age or have lower quality clothing compared to others in their party;

- Individuals have few or no personal items—such as no luggage or other bags;

- Individuals appear to be with a significantly older "boyfriend" or in the company of older males;

- A group of girls appears to be traveling with an older female or male;

---

[8] United States Department of Homeland Security Blue Campaign – One Voice. One Mission. End Human Trafficking, https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf (last visited April 13, 2023);National Center for Missing and Exploited Children, https://www.missingkids.org/theissues/trafficking#riskfactors (last visited April 13, 2023); Love 146, *Red Flags for Hotel & Motel Employees*, https://love146.org/wp-content/uploads/2017/04/Hospitality-Red-Flag-and-Reporting-Love146.pdf (last visited April 13, 2023); Texas Attorney General, *Human Trafficking Red Flags*, https://www2.texasattorneygeneral.gov/files/human_trafficking/human_trafficking_red_flags_handout.pdf (last visited April 13, 2023).
[9] *See Id.*

- A group of males or females with identical tattoos in similar locations. This may indicate "branding" by a trafficker;

- Drug abuse or frequent use of "party drugs" such as GHB, Rohypnol, Ketamine, MDMA (Ecstasy), Methamphetamines, Cocaine, and Marijuana;

- Possession of bulk sexual paraphernalia such as condoms or lubricant;

- Possession or use of multiple cell phones; and

- Possession or use of large amounts of cash or pre-paid cards.

30.     The signs of sex trafficking in a hotel environment follow well-established patterns and can easily be detected by appropriately trained staff.

31.     Toolkits specific to the hotel industry have been developed, which help hotel staff in every position identify and respond to signs of sex trafficking.[10]  From check-in to check-out, there are indicators that traffickers and their victims routinely exhibit during their stay at a hotel.

32.     The relationship between a pimp and a prostitute is inherently coercive, and the United States Department of Justice and other agencies and organizations have recognized that most individuals involved in prostitution are subject to force, fraud, or coercion.[11] It is also well understood that "prostitution," "sex trafficking," and "child sex trafficking" involve a single common denominator, the exchange of sex for money.

33.     The definition of sex trafficking in the TVPRA under 18 U.S.C. §1591(a)(1) incorporates the definition of commercial sex act. Defendants understood the practical and legal association between commercial sex and sex trafficking in a hotel environment. Thus, Defendants

---

[10] Department of Homeland Security, *Blue Campaign Toolkit*,
https://www.dhs.gov/sites/default/files/publications/blue-campaign/toolkits/hospitality-toolkit-eng.pdf.
[11] *See, e.g.*, *A National Overview of Prostitution and Sex Trafficking Demand Reduction Efforts, Final Report*,
https://www.ojp.gov/pdffiles1/nij/grants/238796.pdf; *Prostitution and Trafficking in Women: An Intimate Relationship*, https://www.ojp.gov/ncjrs/virtual-library/abstracts/prostitution-and-trafficking-women-intimate-relationship.

knew or should have known that signs of commercial sex (prostitution) activity in their hotels were in fact signs of sex trafficking.[12]

34.    All Defendants were aware or should have been aware of these signs of sex trafficking when operating, controlling, and managing their hotel properties, when enacting and enforcing policies and procedures applicable to those hotels and when training, educating, and supervising the staff of the Travelodge hotel.

35.    The most effective weapon against sexual exploitation and human trafficking is education and training.[13]  As ECPAT concluded:

> The hospitality industry is in a unique position to identify and report human trafficking due to its perceived anonymity. Traffickers believe they can go unnoticed while exploiting victims across the globe in hotels— ranging from budget properties to luxury resorts. From check-in to check-out, there are a number of indicators victims and exploiters exhibit during the time they are on a hotel property.[14]

36.    This same conclusion is echoed by others who seek to eliminate sex trafficking in the hospitality industry, including the American Hotel Lodging Association: "Hotel employees who have undergone training are more aware of trafficking when it happens – and are more willing to report it – than those who have not been trained.[15]  In reference to companies like the Defendants, ECPAT observed: "If they do nothing to raise awareness or to prevent child trafficking, they risk becoming an indirect and unintentional conduit for the abuse that takes place."

---

[12] *Id.*

[13] Polaris, *Recognizing Human Trafficking*, https://polarisproject.org/recognizing-human-trafficking/ (last visited April 13, 2023).

[14] ECPAT USA, *Training for Hotel Associates*, https://www.ecpatusa.org/hotel-training (last visited April 13, 2023). *See also* Carolin L. et al., *Sex Trafficking in the Tourism Industry*, J. Tourism Hospit. (2015), https://www.longdom.org/open-access/sex-trafficking-in-the-tourism-industry-2167-0269-1000166.pdf.

[15] AHLA, *Free Online Training*, https://www.ahla.com/issues/human-trafficking (last visited April 13, 2023).

37.     Given the prevalence of human trafficking in hotels and the abundance of information about how franchisors, owners, operators and hotel employees can identify and respond to this trafficking, it has become apparent that the decision of a hotel chain to continue generating revenue from traffickers without taking reasonable steps to identify and prevent trafficking in its hotels is a conscious decision to financially benefit by supporting and facilitating unlawful sex trafficking.

38.     Each of the Defendants had a responsibility to adopt, implement, and adequately enforce policies to avoid facilitating sex trafficking and to train the Travelodge hotel staff to identify and respond to "red flags" of sex trafficking.

## III.    Sex Trafficking Has Long Been Prevalent at Wyndham Branded Properties, and Defendants Have Known About It.

39.     Defendants' actual knowledge is *not* limited to a general awareness of the problem of sex trafficking in the hotel industry. Each of the Defendants has known, since well before Jane Doe (A.L.G.)'s trafficking, that sex trafficking was ongoing and widespread at Wyndham branded properties including at the Travelodge hotel.

40.     Unfortunately for Jane Doe (A.L.G.), the promises made by the Franchisor Defendants and Franchisee Defendants have proven empty. Defendants have failed, at all levels, to take appropriate action in response to their knowledge of widespread and ongoing human trafficking in their hotels. Instead, they have continued financially benefiting by providing venues for the sexual exploitation of victims like Jane Doe (A.L.G.).

### a.   Sex Trafficking at Wyndham Branded Hotels was well Known by Defendants.

41.     Use of Wyndham branded properties, including Travelodge properties, for sex trafficking is well known to Wyndham.

42.     Upon information and belief, at all relevant times Wyndham has adopted a centralized approach to trafficking-related issues at all its branded properties. Wyndham's public statements confirm that it knew sex trafficking was a problem at its hotels and that it retained control over the response of its branded hotels to sex trafficking. Wyndham has recognized it has a "critical role in increasing awareness and prevention" of sex trafficking in its hotels.[16] It has publicly claimed to be taking steps to avoid facilitating sex trafficking in its hotels since at least 2011.[17] However, Wyndham has refused to publish reports to show its progress on the EPCAT goals to combat sex trafficking in hotels.[18]

43.     Unfortunately, while Wyndham's statements reflect actual knowledge of the problem of sex trafficking, they reflect only a public relations strategy rather than a genuine commitment to stop facilitating trafficking. Emails among company executives reflect a hesitance to commit to meaningful anti-trafficking measures and a desire to avoid negative publicity without any significant burden.[19]

44.     The problem of sex trafficking at Wyndham properties was sufficiently well known that, in 2011, there was a public petition with thousands of signatures to stop Wyndham hotel staff from supporting child sex trafficking.[20] Although Wyndham publicly committed to take steps to stop facilitating trafficking, this promise proved empty; Wyndham has been named a "major

---

[16] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[17] https://hotelsmag.com/news/wyndham-implements-anti-prostitution-training/
[18] https://thecode.my.salesforce-sites.com/apex/MemberProfilenew?id=0019000000GxgPrAAJ&year=2023
[19] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("Scott McLester, Wyndham's former general counsel and chief compliance officer, wrote in an e-mail to the company's then C.E.O., Stephen Holmes, 'Even though we have been hesitant to commit to everything the [EPCAT] Code was asking for, the issue is not going away and it's starting to impact commercial relationships.' McLester added that the organization's 'concern about being 'bullied' into signing the Code is outweighed by the relative harmlessness of the Code itself.'")
[20] https://www.change.org/p/stop-wyndham-hotel-staff-from-supporting-child-sex-trafficking-in-wyndham-hotels

contributor to sexual exploitation" and part of the "dirty dozen list" by the National Center on Sexual Exploitation.[21]

45.    Sex trafficking was prominent at Wyndham branded properties, including Travelodge properties. Public information, including scores of news stories and online reviews, confirms both the widespread sex trafficking problem at Wyndham branded hotels and Defendants' knowledge and understanding of the problem.

46.    In the past twenty years, Wyndham-branded properties have been mentioned in at least two hundred criminal trafficking cases filed by the federal government.[22]

47.    Examples of notable press involving the frequent use of Wyndham branded hotels for illegal activity, including sex trafficking at Travelodge locations across the country include:

- In March 2006, a minor forced into prostitution testified about her trafficking experience specifically recalling her time at the Travelodge in Silver Spring, Maryland.[23]

- In November 2008, a trafficker and local gang member out on bail attacked a trafficking victim at a Travelodge in Tukwila, Washington.[24]

- In April 2011, franchisees of a Travelodge in Oceanside, California were charged with facilitating prostitution activities of local gangs at the hold. The article states that the franchisees charged higher rates for hotel rooms in exchange for permitting the prostitution activities to be conducted at the Travelodge.[25]

- In May 2012, Anaheim police uncovered a child sex trafficking operation in Orange County, California. A minor victim told authorities she had been staying at a Travelodge near Beach Boulevard.[26]

---

[21] https://endsexualexploitation.org/wyndham/
[22] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/
[23] https://www.nbcnews.com/id/wbna11689661
[24] https://www.westsideseattle.com/robinson-papers/2009/03/28/local-gang-members-charged-prostitution-sting
[25] https://www.cbs8.com/article/news/gang-members-and-hotel-owners-indicted-in-sex-trafficking-prostitution-conspiracy/509-d4700722-d6e2-4648-bb02-555f884345bd
[26] https://www.nbclosangeles.com/news/local/orange-county-oc-anheim-teen-pimping/1923363/

- In October 2013, a minor and her trafficker arrested at a Travelodge in Oklahoma City, Oklahoma after the seventeen year old girl agreed to engage in sexual relations with an officer in exchange for money.[27]

- In April 2014, a trafficker stood trial where his sixteen year old victim recalled her trafficking experience at a Travelodge in El Segundo, California.[28]

- In May 2014, a man was arrested for human trafficking, pimping, and kidnapping at a Travelodge in Clearlake, California after officers observed red flags of human trafficking in the hotel parking lot.[29]

- In August 2014, two men were arrested at a Travelodge in Wilmington, North Carolina on kidnapping and human trafficking charges after officers found them with two missing North Dakota teens.[30]

- In August 2014, a serial sexual offender was arrested while attempting to start a prostitution ring after two women reported his attempts at a Travelodge in Las Vegas, Nevada to police.[31]

- In June 2015, officers received a report regarding a potential victim of sex trafficking at a Travelodge in Newport News, Virginia which led to the arrest of two people involved in the operation.[32]

- In February 2016, a Travelodge in Brook Park, Ohio was shut down for trafficking. There were hundreds of nuisance reports against the hotel. The city's mayor and county prosecutor called it "a breeding ground for human and drug trafficking for years."[33]

- In January 2017, a hearing was set for a man arrested for human trafficking of a minor after he forced a sixteen year old girl to have sex with multiple men over a two-day stay at the Travelodge in Turlock, California.[34]

---

[27] https://www.koco.com/article/officers-man-teen-arrested-on-suspicion-of-human-trafficking-in-okc/4295541
[28] https://www.dailybreeze.com/2014/04/22/gardena-man-charged-with-trafficking-teenage-girl-for-prostitution/
[29] https://lakeconews.com/news/36992-clearlake-man-arrested-for-human-trafficking-pimping-and-kidnapping
[30] https://portcitydaily.com/local-news/2014/08/13/missing-north-dakota-sisters-found-in-wilmington-two-men-charged-with-kidnapping-human-trafficking/
[31] https://www.lvcriminaldefense.com/sexual-offender-charged-with-sex-trafficking-started-a-prostitute-ring/
[32] https://www.wtkr.com/2015/07/09/two-arrested-in-newport-news-sex-trafficking-investigation?_amp=true
[33] https://www.news5cleveland.com/news/local-news/oh-cuyahoga/cleveland-mayor-prosecutor-to-shut-down-brook-park-travelodge-due-to-drug-human-trafficking
[34] https://www.turlockjournal.com/news/crime/hearing-set-for-man-accused-of-pimping-out-teen-girl-in-turlock/

- In April 2018, police arrested a man on human trafficking charges at a Travelodge in Iowa City, Iowa in response to a complaint that a minor victim was being held against her will.[35]

- In July 2019, a man was charged with two felony counts of sex trafficking among other charges after an armed standoff at a Travelodge in York County, Virginia.[36]

- In September 2020, the Colorado Springs Police Department began an investigation of a Travelodge in Colorado Springs, Colorado after receiving numerous reports of ongoing criminal activity, violent crimes, human trafficking, and narcotics violations at the hotel. Twelve individuals were arrested at the hotel in November 2020 as a result of this investigation.[37]

- In August 2021, a man was arrested for human trafficking after moving a nineteen year old victim across the country and trafficking her for sex at a Travelodge in South San Fransico, California.[38]

- A November 2022 article recounts the activities of San Diego, California gang members running a child sex trafficking ring from 2006 to 2011. The article states that Travelodge staff would allow the gang to use the hotel computer to post online ads advertising sex with minors and would rent them rooms for higher rates and pocket the difference.[39]

48.    Ultimately, several hundred traffickers involved with hundreds of victims have been prosecuted by state and federal law enforcement agencies for sex trafficking and forced prostitution out of Wyndham branded properties.

49.    Similarly, Defendants knew sex trafficking was occurring at their hotels through publicly available online review websites, which are regularly reviewed by companies such as Defendants. For example, for Travelodge locations:

---

[35] https://www.press-citizen.com/story/news/2018/04/02/iowa-city-man-accused-pimping-teenage-girl-and-holding-her-against-her/477561002/

[36] https://wydaily.com/news/local/2019/10/09/man-accused-of-sex-trafficking-motel-standoff-not-competent-to-stand-trial/

[37] https://coloradosprings.gov/police-department/article/news/human-trafficking-arrests-travelodge

[38] https://findingkids.org/man-charged-with-human-trafficking-in-san-mateo-county/

[39] https://etactics.com/blog/hotels-involved-in-human-trafficking

- In December 2007 regarding a Travelodge in Seattle, Washington, a reviewer wrote "…They seem to let alot of prostitutes stay there wearing practicly nothing, I was apauled. At night the street right in front is full of drug addicts and prostitutes and they just let it go on…."[40]

- In September 2008 regarding a Travelodge in San Francisco, California, a reviewer wrote "…The bed has stains of gosh knows what. The walls were thin enough to hear the upstair patrons having sex at 8 in the morning. Waking up to "spank me harder" wasn't quite the wake up call I was expecting…."[41]

- In September 2008 regarding a Travelodge in Tacoma, Washington, a reviewer wrote "…Along with the truckers, there were two "lot lizards" seen mulling about and going from one room to another (prostitutes)…."[42]

- In March 2009 regarding a Travelodge in Seattle, Washington, a reviewer wrote "…The rooms are mostly clean and serviceable. Perfect for a providing a service in them, apparently, by the amount of hoes we saw delivered in the lobby.Even better than the parade of hoes and pimps outside was the people checking in to record some (I'm sure) tasteful cinematic (and naked) photography.Even better than all of this was the obvious tweakers checking in to do who knows what…."[43]

- In January 2011 regarding a Travelodge in San Francisco, California, a reviewer wrote "…If you like hangin' out with prostitutes and crack-heads, this hotel is for you!..."[44]

- In June 2012 regarding a Travelodge in Anaheim, California, a reviewer wrote "We booked four rooms for six nights, but we were all split up on different floors. The fourth night we were there, there was a problem with a prostitute next door to my sisters room. Just as soon as that problem was taken care of, there was YET another prostitute problem in another room. After speaking to one of the staff she informed us that prostitution was a common problem at this location…."[45]

- In July 2012 regarding a Travelodge in Bellingham, Washington, a reviewer wrote "We arrived lost and late - having been to a nearby Gas station and asked for directions we were told why are you staying on 'Hooker' row!!!..."[46]

---

[40] https://www.tripadvisor.com/Hotel_Review-g60878-d100574-Reviews-Travelodge_by_Wyndham_Seattle_by_the_Space_Needle-Seattle_Washington.html
[41] https://www.yelp.com/biz/travelodge-by-wyndham-san-francisco-central-san-francisco?start=220
[42] https://www.tripadvisor.co/Hotel_Review-g58473-d110998-Reviews-Travelodge_by_Wyndham_Port_of_Tacoma_WA-Fife_Washington.html
[43] https://www.yelp.com/biz/travelodge-by-wyndham-seattle-by-the-space-needle-seattle?start=60
[44] https://www.yelp.com/biz/travelodge-by-wyndham-san-francisco-central-san-francisco?start=220
[45] https://www.tripadvisor.com/Hotel_Review-g29092-d75528-Reviews-Ramada_by_Wyndham_Anaheim_Convention_Center-Anaheim_California.html
[46] https://www.expedia.com/Bellingham-Hotels-Bellingham-Lodge.h43116.Hotel-Reviews

- In December 2012 regarding a Travelodge in Fort Lauderdale, Florida, a reviewer wrote "Stayed there for one week and a half, the majority of occupants were either severely drunken or solicitors. As you are about to open your door to exit the room most like you will be close to bumped into someone waiting outside to ask for money. Twice I was offered sex through intermediaries. Constant arguments among drunks, loud and obnoxious. Trails of Vomits along the hallway."[47]

- In May 2013 regarding a Travelodge in Oklahoma City, Oklahoma, a reviewer wrote "me my husband and two daughters stayed while visiting our family a lot of noise and drug dealing and prostitution seemed to be coming from room 242 we complained to the manager who claimed the room was empty and there were no guests at that place so i thought that makes no sense so as the night carried on my daughter lynda (14) and elizabeth (17) was approached by a young female and an older man that was in room 242 they had asked them if they wanted to make money with their bodies now the young girl looked to be under age and under nourished and clearly on drugs the older man had a gun and had also told my daughters that i know some powerful people and if you dont take my offer then i can make you and your family disappear so they ran off and thats when we left and will return there again i think the motel should pay for my daughters counseling bills"[48]

- In September 2013 regarding a Travelodge in Fort Lauderdale, Florida, a reviewer wrote "…SEX INFESTED SESS POOL.STAY AWAY IF YOU VALUE YOUR LIFE AND YOUR FAMILIES!"[49]

- In March 2014 regarding a Travelodge in Fort Lauderdale, Florida, a reviewer wrote "…Hookers living on property…."[50]

- In February 2015 regarding a Travelodge in Colorado Springs, Colorado, a reviewer wrote "…There was obvious human trafficking all night up and down the hallways and in the parking lot…."[51]

- In July 2018 regarding a Travelodge in Platte City, Missouri, a reviewer wrote "Drug addict standing outside room asking if I wanted to have sex…"[52]

---

[47] https://www.tripadvisor.co/Hotel_Review-g34227-d87302-Reviews-Ocean_Reef_Hotel-Fort_Lauderdale_Broward_County_Florida.html
[48] https://www.tripadvisor.com/Hotel_Review-g51560-d95763-Reviews-Traveler_s_Inn_Suites_Oklahoma_City_Airport-Oklahoma_City_Oklahoma.html
[49] https://www.tripadvisor.com/Hotel_Review-g34227-d87358-Reviews-Travelodge_by_Wyndham_Fort_Lauderdale-Fort_Lauderdale_Broward_County_Florida.html
[50] https://www.tripadvisor.com/Hotel_Review-g34227-d87358-Reviews-Travelodge_by_Wyndham_Fort_Lauderdale-Fort_Lauderdale_Broward_County_Florida.html
[51] https://www.tripadvisor.com/Hotel_Review-g33364-d85174-Reviews-or415-Travelodge_by_Wyndham_Colorado_Springs-Colorado_Springs_El_Paso_County_Colorado.html
[52] https://www.expedia.com/Kansas-City-Hotels-Travelodge-By-Wyndham-Airport-Platte-City.h905415.Hotel-Reviews

- In July 2019 regarding a Travelodge in Romulus, Michigan, a reviewer wrote "A man tried to solicit me for sex. I told the staff and he was never asked to leave…"[53]

- In February 2020 regarding a Travelodge in Milwaukee, Wisconsin, a reviewer wrote "…THE STAFF NEVER ADDRESSED ITS OPEN SEX TRAFFICKING AND DRUG ADDICTS EVERYWHERE…"[54]

- In December 2021 regarding a Travelodge in Bellingham, Washington, a reviewer wrote "…A guy offered me money for sex!!..."[55]

- In January 2022 regarding a Travelodge in Manhasset, New York, a reviewer wrote "…The common areas the lobby were simply deplorable with too many nasty and unacceptable things… Don't stay here unless it's a short stay sex romp with a hook-up!"[56]

- In May 2022 regarding a Travelodge in Bay Shore, New York, a reviewer wrote "…All night the room next to ours had sexual activity going on. When we checked out at 8AM the Johns & Hookers going through the lot asked my husband & I if we wanted ago with them…."[57]

50.     This sampling of news stories, reviews, and other public information establishes that, at the time Jane Doe (A.L.G.) was trafficked at the Travelodge Hotel, the Wyndham Defendants knew or should have known that:

a.  There was widespread and ongoing sex trafficking occurring at Wyndham branded properties.

b.  Sex trafficking was a brand-wide problem for Wyndham originating from management level decisions at their corporate offices in Parsippany, NJ.

c.  Wyndham franchisees and hotel staff were not taking reasonable steps to identify and respond to known or probable sex trafficking occurring at their hotel properties and were facilitating sex trafficking at the branded hotel properties.

d.  Wyndham's efforts, if any, to stop facilitating sex trafficking in their branded properties were not effective.

---

[53] https://www.expedia.com/Detroit-Hotels-Travelodge-By-Wyndham-Romulus-Detroit-Airport.h969428.Hotel-Reviews
[54] https://www.ca.kayak.com/Milwaukee-Hotels-Travelodge-by-Wyndham-Milwaukee.389075.ksp
[55] https://www.expedia.com/Bellingham-Hotels-Bellingham-Lodge.h43116.Hotel-Reviews
[56] https://www.expedia.com/Manhasset-Hotels-Travelodge-By-Wyndham-Manhasset.h10620700.Hotel-Reviews
[57] https://www.tripadvisor.co/Hotel_Review-g47286-d266057-Reviews-Travelodge_by_Wyndham_Bay_Shore_Long_Island-Bay_Shore_Long_Island_New_York.html

e. Wyndham and its franchisees were earning revenue by providing venues where widespread and ongoing sex trafficking was occurring.

51.    Despite the mounting evidence that sex trafficking at its properties was ongoing and growing, Wyndham continued to earn revenue by continuing conduct that they knew or should have known facilitated sex trafficking.

**b. Wyndham Defendants had actual and constructive knowledge of widespread and ongoing sex trafficking at the Travelodge Hotel.**

52.    Wyndham Defendants were specifically aware that sex trafficking was widespread and ongoing at the Travelodge Hotel.

53.    Internet reviews for the Travelodge Hotel, which upon information and belief the Wyndham Defendants managed and monitored, show the pervasiveness of sex trafficking and other criminal activity around the time and well after Jane Doe (A.L.G.) was trafficked. For example:

- April 2014 Expedia review of the Travelodge Hotel states "…Stay here if your researching cockroaches or your an undercover vice or drugs detective. You will be busy. I found the team of homeless guys at the intersection friendly and the woman meeting the men off Craig's list in reception was polite and upfront too…"[58]

- July 2014 Yelp review of the Travelodge Hotel states "This is not a hotel it is a place where the vagrants of Austin stay toDeal drugs, buy hookers and steal credit cards to go shopping and leave the evidence behind…"[59]

- September 2014 Yelp review of the Travelodge Hotel states "…Pimps and drug dealers all over outside and in hallways till morning... I felt very unsafe just going to my car after dark. Then the manager had the nerve to come knocking at 5pm saying me and my guests were "talking too loud!" He said my guests need to check-in before visiting in my room! Really? I sure didn't see him out there last night telling the pimps to take their business elsewhere!..."[60]

- September 2014 Yelp review of the Travelodge Hotel states "…There were everything from crackheads to drug attics to pimps. Oh and let me tell you how friendly they are They have no problem With knocking at your door at 1 o'clock in the morning asking

---

[58] https://www.expedia.com/Austin-Hotels-Holiday-Inn-Austin-Midtown.h424039.Hotel-Reviews
[59] https://www.yelp.com/biz/travelodge-austin-austin-2
[60] Id.

for your cell phone or cornering you in the hallway for money or your phone while your walk to your room. And believe me this wasn't a one time thing this happened 6 times within a 10 day stay…"[61]

- January 2015 Google review of the Travelodge Hotel states "….I wasn't to find out until later that the Travelodge is known by the locals to be a haven for drugs and prostitution, and that it's the site of frequent raids…"[62]

- March 2021 Expedia review of the Travelodge Hotel states "…Drug deals went on on the parking lot…"[63] This review elicited a response from Defendants.

54.    The timing, scope and content of these reviews establish the existence of sex trafficking and commercial sex at the Travelodge hotel long before reaching the level evidenced by direct customer observations.

55.    Traffickers, including Jane Doe (A.L.G.)'s traffickers, repeatedly chose to use the Travelodge Hotel for their sex trafficking activity. As such, Defendants also knew or should have known about the pervasive sex trafficking at the hotel based on obvious indicators of this activity.

56.    Upon information and belief and based on hotel reviews and records of law-enforcement calls, there were multiple trafficking victims exploited at the Travelodge Hotel prior to Jane Doe (A.L.G.)'s trafficking who exhibited "red flags" of trafficking that were observed by hotel staff and management, including paying with cash or prepaid cards, having high volumes of men who were not registered guests in and out of their room at unusual times, arriving with few possessions for extended stays, and other signs consistent with the "red flags" of trafficking identified above.

57.    Trafficking has a significant effect on its victims, and, upon information and belief, there were obvious "red flags" of trafficking apparent from the appearance, demeanor, and

---

[61] Id.

[62] https://www.google.com/search?q=Travel%20Lodge%206200%20Middle%20Fiskville%20Rd%2C%20Austin%2C%20TX%2078752&hl=en

[63] https://www.expedia.com/Austin-Hotels-Holiday-Inn-Austin-Midtown.h424039.Hotel-Reviews

restricted movements of these victims, as well as the nature of these victims' interactions with their traffickers and others, all of which provided notice to Defendants that these victims, including Jane Doe (A.L.G.), were being subject to violence, coercion, control, and exploitation at the Travelodge hotel.

58.    All knowledge from the staff at the hotel is imputed to Wyndham. Wyndham knew about this widespread and ongoing trafficking at the hotel, including the trafficking of Jane Doe (A.L.G.), through the direct observations of hotel staff, including management-level staff.

59.    Upon information and belief, Wyndham knew or should have known about widespread and ongoing trafficking activity at the hotel property because of non-public information available because Wyndham:

    a.  conducted regular inspections of the hotel property;

    b.  employed "field agents" to work with hotels on trafficking issues;

    c.  publicly represented that it monitored and audited hotels to determine the status of anti-trafficking efforts;

    d.  required franchisee and hotel staff to report suspected trafficking activity to Franchisor;

    e.  was involved in day-to-day consulting on operational issues at hotel;

    f.  had access to surveillance systems;

    g.  collected and monitored data that showed patterns consistent with trafficking;

    h.  participated in internal investigations;

    i.  solicited and received customer feedback and complaints;[64]

---

[64] https://journalism.berkeley.edu/projects/should-hotel-chains-be-held-liable-for-human-trafficking/ ("In every case, Wyndham received the guest complaint, monitored the response, and tried to placate disgruntled guests with Wyndham Rewards hotel points.")

60.     Upon information and belief, under the Wyndham Defendants' protocols, which on their face required hotel staff and management to report suspected criminal activity to the Wyndham Defendants, hotel staff and management were required to report numerous instances of suspected sex trafficking to the Wyndham Defendants prior to Jane Doe (A.L.G.)'s trafficking based on the numerous "red flags" exhibited by the victims who were exploited at the subject Wyndham properties.

61.     Upon information and belief, Wyndham adopted a protocol that, on its face, required hotel staff and franchisees to report suspected criminal activity, including suspected prostitution and sex trafficking, to Wyndham. Based on the existence of this protocol and the widespread and obvious trafficking at the subject properties, there were multiple instances of suspected sex trafficking at the Travelodge hotel that were or should have been reported to Wyndham.

62.     Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham-branded hotels, and at the Travelodge hotel, Wyndham and the Franchisee Defendants each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject hotel and to make a reasonable investigation in response to signs of potential sex trafficking. If Wyndham and the Franchisee Defendants had used reasonable prudence, they would have been aware of the widespread and ongoing trafficking at the subject hotel and that they were benefiting from such trafficking.

63.     Wyndham and the Franchisee Defendants had constructive knowledge of the widespread and ongoing trafficking at the property because this trafficking resulted from their failure to exercise due diligence and ordinary care in the operation of the Travelodge hotel.

**c.    Defendants knew Jane Doe (A.L.G.) was being trafficked at the subject Wyndham properties because of the apparent and obvious "red flags" of sex trafficking.**

64.    During the period that Jane Doe (A.L.G.) was trafficked at the Travelodge Hotel, there were obvious signs that her traffickers were engaged in sex trafficking:

    a.    Jane Doe (A.L.G.) would sometimes book the room herself. The hotel staff observed her and saw that she was emotional, nervous, scared, and had few or no personal items.

    b.    When checking in, Jane Doe (A.L.G.) had visible signs of abuse on her face and body and showed signs of malnourishment, poor hygiene, and sleep deprivation;

    c.    The hotel rooms in which she was trafficked were frequently paid for with cash or pre-paid cards.

    d.    Other girls were being trafficked at the same hotel at the same time as A.L.G. by her traffickers.

    e.    Hotel staff saw Jane Doe (A.L.G.) arrive and leave with her traffickers who were visibly older than A.L.G.

    f.    The "Do Not Disturb" door hanger was used very frequently.

    g.    Her traffickers often asked for a room far away from the hotel office.

    h.    Housekeeping staff was often prevented from entering the room for regular cleaning, towel exchange and other standard room services.

    i.    Jane Doe (A.L.G.) had many johns every day. These individuals entered and left at unusual hours and were present at the hotel for brief periods of time.

    j.    There was heavy foot traffic in and out of Jane Doe (A.L.G.)'s room involving men who were not hotel guests. This traffic was visible to hotel staff.

    k.    Other obvious signs of trafficking consistent with the modus operandi of her trafficker and which included well known "red flags" for trafficking in a hotel.

65.    Based upon information and belief, multiple employees at the Travelodge Hotel, including management-level employees, observed or were made aware of these obvious signs of trafficking while acting within the scope and course of their employment.

66.    As such, Defendants knew or were willfully blind to the fact that Jane Doe (A.L.G.) was being trafficked at the Travelodge Hotel.

67.     Given these obvious signs, Wyndham Defendants knew or should have known about the trafficking of Jane Doe (A.L.G.) based on its policy or protocol that required hotel staff to report suspected criminal activity including sex trafficking.

68.     Defendants also knew or should have known about Jane Doe (A.L.G.)'s trafficking based on the other methods, listed above, that they used to monitor and supervise the subject properties.

69.     Based on their knowledge of the problem of sex trafficking in the hotel industry, at Wyndham-branded hotels, and at the Travelodge Hotel, Wyndham and the Franchisee Defendants each had a duty to exercise reasonable prudence to detect ongoing sex trafficking at the subject hotels and to make a reasonable investigation in response to signs of potential sex trafficking. If Wyndham and the Franchisee Defendants had used reasonable prudence, they would have been aware of Jane Doe (A.L.G.)'s trafficking at the Travelodge Hotel and that they were benefiting from such trafficking.

## IV.    Defendants actively facilitated sex trafficking at the Travelodge Hotel, including the trafficking of Jane Doe (A.L.G.)

70.     Defendants had both actual and constructive knowledge of the trafficking of Jane Doe (A.L.G.) at the Travelodge Hotel because the trafficking was the direct result of Defendants facilitating her trafficking at the property.

### a.    Franchisee Defendants facilitated the trafficking of Jane Doe (A.L.G.) at the Travelodge Hotel.

71.     Franchisee Defendants are responsible for the acts, omissions, and knowledge of all employees of the Travelodge Hotel when operating the hotel because these acts and omissions were committed in the scope and course of employment, because Franchisee Defendants ratified these acts and omissions, and because Franchisee Defendants failed to exercise reasonable care

with regard to the hiring, training, and supervision of these employees given the specific risks, known to Franchisee Defendants, of sex trafficking occurring at Wyndham properties including the Travelodge Hotel.

72.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Travelodge Hotel, Franchisee Defendants continued renting rooms to these traffickers, including the rooms used to sexually exploit victims, including Jane Doe (A.L.G.).

73.    Franchisee Defendants knew or were willfully blind to the fact that Jane Doe (A.L.G.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them a venue in the form of hotel rooms and related services, to facilitate Jane Doe (A.L.G.)'s sexual exploitation.

74.    Franchisee Defendants also facilitated widespread trafficking at the Travelodge Hotel, including the trafficking of Jane Doe (A.L.G.), in each of the following ways:

a.    allowing inappropriate and inadequate practices for hiring, training, supervising, managing, and disciplining front-line staff regarding issues related to human trafficking;

b.    inadequate and inadequately enforced sex trafficking notice and training for hotel staff;

c.    choosing not to report known or suspected criminal activity including sex trafficking to the appropriate law enforcement agencies according to reasonable practices, industry standards, and/or applicable franchisor policies and procedures;

d.    implicitly encouraging the activities of traffickers by creating an environment where they did not need to incur the burden of taking significant steps to conceal their activities but, instead, could operate without concern for detection or interference by the hotel staff.

**b.    Wyndham Defendants facilitated the trafficking of Jane Doe (A.L.G.) at the Travelodge Hotel.**

75.     Upon information and belief, the Wyndham Defendants participated directly in the operation of the Travelodge Hotel that influenced whether and to what extent trafficking occurred at the hotel, including but not limited to the trafficking of Jane Doe (A.L.G.), as follows:

    a.  assuming joint responsibility with the franchisee for detecting and preventing human trafficking at the hotel property;

    b.  assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols requiring hotel staff to report suspected criminal or trafficking activity to the franchisor;

    c.  assuming or retaining control over and responsibility for training hotel staff on detecting and responding to human trafficking;

    d.  assuming or retaining control over and responsibility for adopting, monitoring, and enforcing policies and protocols regarding detecting and responding to human trafficking;

    e.  employing field-based associates who work with hotels on trafficking issues;

    f.  assessing or auditing hotel properties, specifically, for the purpose of evaluating whether safety and security measures related to trafficking are in place;

    g.  establishing systems for guests to report security issues to franchisor;

    h.  requiring franchisees to provide Wi-Fi/internet access to guests;

    i.  mandating the specific tools and systems that franchisees must use to provide Wi-Fi/internet access to guests;

    j.  setting policies and protocols regarding guest use of Wi-Fi/internet, filtering and site-blocking mechanisms deployed, and monitoring/tracking of guest usage;

    k.  requiring franchisees to use a system to monitor and track housekeeping requests;

    l.  setting policies for when and how housekeeping services are provided;

    m.  collecting and monitoring data that shows patterns of use of housekeeping services;

    n.  setting policies for when and how hotel staff can accept tips.

76.     Wyndham Defendants directly participated in and retained day-to-day control over renting rooms at the Travelodge Hotel in the following ways:

a.   controlling all details of the guest reservation, check-in, and payment processes through management and control over all systems used for those processes and adoption of detailed and specific policies governing the means and methods used for each of these processes;

b.   controlling and overseeing policies and procedures regarding check-in, payment, and identity verification procedures, including whether cash and prepaid cards could be used and who had to show identification.

c.   requiring the franchisee to use the franchisor's centralized reservation system and preventing the franchisee from using any other system;

d.   reserving rooms and accept payments without requiring franchisee approval or involvement;

e.   controlling and restricting the ability of franchisee and staff to refuse or cancel a reservation.

f.   requiring the franchisee to use a software system operated and controlled by the franchisor for booking rooms and checking guests into rooms;

g.   requiring the franchisee to use a software system operated and controlled by the franchisor to process payments;

h.   requiring the franchisee to use a property-management system operated and controlled by the franchisor;

i.   requiring the franchisee to use a data-management system operated and controlled by the franchisor;

j.   ensuring that data related to each room reservation passes through systems owned, maintained, and managed by the franchisor;

k.   exercising control over the price of rooms;

l.   controlling all details of the customer loyalty program that the franchisee was required to implement;

m.   setting detailed policies for the check-in process, including requirements for identification and payment methods;

n.   collecting guest data, requiring franchisees to report guest data, and reviewing and analyzing guest data, including names, payment information, reservation history, internet browsing data, and other details associated with their stay;

o.   assuming sole ownership over all guest information;

26

p.   overseeing do not rent (DNR) lists for its branded properties.

77.    Despite having actual or constructive knowledge of widespread and ongoing sex trafficking at the Travelodge hotel, Wyndham Defendants continued renting rooms to traffickers, including the rooms used to sexually exploit victims, including Jane Doe (A.L.G.).

78.    Wyndham Defendants knew or should have known that Jane Doe (A.L.G.) was being trafficked and, despite this, benefited from continued association with her traffickers by providing them hotel rooms and related services to facilitate Jane Doe (A.L.G.)'s sexual exploitation.

79.    Upon information and belief, despite having actual or constructive knowledge of the ongoing sex trafficking at the Travelodge Hotel, the Wyndham Defendants continued participating in a venture at that hotel, with its franchisees and the hotel staff, in a way that it knew or should have known would lead to additional sex trafficking at the hotel, including but not limited to by the following:

a.   adopting, maintaining, and enforcing policies and practices regarding guest identification in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to secure rooms without providing their own identifying information;

b.   adopting, maintaining, and enforcing policies and practices regarding payment methods in a way that facilitated trafficking by allowing traffickers, including Jane Doe's traffickers, to pay for rooms using non-traceable methods;

c.   adopting and enforcing training methods for the franchisee and hotel staff in a way that led to widespread and ongoing trafficking at the hotel property;

d.   adopting and enforcing policies and protocol regarding trafficking in a way that led to widespread and ongoing trafficking at the hotel property;

e.   providing traffickers continued access to Franchisor-maintained internet systems despite having active or constructive knowledge this access was being used for advertising services related to their trafficking activities;

     f.   adopting inappropriate and inadequate practices for monitoring, supervising, and responding to issues regarding the conduct of Franchisee and hotel staff related to human trafficking at subject Days Inn;

     g.   implicitly or explicitly encouraging franchisee to continue facilitating trafficking by continuing the same methods of operation at the hotel property despite obvious evidence that those methods were leading to widespread and ongoing sex trafficking.

80.     If Wyndham had exercised reasonable diligence when operating the Travelodge Hotel and in the areas where it retained control, Wyndham would have prevented the property from being used to facilitate widespread and ongoing sex trafficking, including the trafficking of Jane Doe (A.L.G.). Instead, Wyndham engaged in the course of conduct that affirmatively facilitated widespread and ongoing sex trafficking, including the trafficking of Jane Doe (A.L.G.).

## V.    Defendants' ventures at the Travelodge Hotel.

81.     Through the conduct described above, Defendants knowingly benefited from engaging in a venture with sex traffickers at the Travelodge Hotel, including Jane Doe (A.L.G.)'s trafficker, as follows:

     a.   Wyndham and Franchisee Defendants both received benefits, including increased revenue, every time a room was rented.

     b.   This venture engaged in violations of violated 18 U.S.C. §1591 through the actions of the criminal traffickers at the properties, which Wyndham and Franchisee Defendants knew or should have known about.

     c.   Wyndham and Franchisee Defendants associated with traffickers, including Jane Doe A.L.G.'s traffickers, by acting jointly to continue to rent rooms to these traffickers despite having actual or constructive knowledge of their sex trafficking activity.

     d.   Wyndham and Franchisee Defendants had a mutually beneficial relationship with the traffickers at the properties, fueled by sexual exploitation of victims.

     e.   Sex traffickers, including Jane Doe A.L.G.'s traffickers, frequently used Wyndham properties for their trafficking because of an implicit understanding that Wyndham properties were a venue that would facilitate their trafficking, providing minimal interference and lowering their risk of detection. This understanding occurred

because of the conduct of Wyndham and Franchisee Defendants facilitating that trafficking as described throughout this complaint. This resulted in benefits, including increased revenue, for Wyndham and Franchisee Defendants.

f.  Both Wyndham and Franchisee Defendants participated in this venture through the conduct described throughout this Complaint as they were jointly responsible for relevant aspects of hotel operations.

g.  Jane Doe A.L.G.'s trafficking at the Travelodge Hotel was a result of Wyndham and Franchisee Defendants' participation in a venture with criminal traffickers. If Wyndham and Franchisee Defendants had not continued participating in a venture that they knew or should have known violated 18 U.S.C. §1591(a), they would not have received a benefit from Jane Doe A.L.G.'s trafficking at the Travelodge Hotel.

82.  Through the conduct described above, each of the Defendants also knowingly benefited from engaging in a commercial venture with other Defendants and with hotel staff as follows:

a.  Wyndham and Franchisee Defendants continued to operate the Travelodge Hotel.

b.  Pursuant to the terms of the franchising agreement, both Wyndham and Franchisee Defendants received financial benefits from operating the property, including revenue generated specifically by renting rooms to traffickers. They engaged in revenue sharing and had a common incentive to maximize revenue.

c.  This venture violated 18 U.S.C. §1591(a) through the conduct of Franchisee Defendants and the widespread sex trafficking at the property.

d.  Despite its actual or constructive knowledge that the venture was engaged in violations of 18 U.S.C. §1591(a), Wyndham participated in the venture by continuing to associate with Franchisee Defendants to operate the property in a way that it knew or should have known would lead to further violations of 18 U.S.C. §1591(a), including trafficking of victims like Jane Doe A.L.G.

e.  Jane Doe A.L.G.'s trafficking was a result of Wyndham's and Franchisee Defendants' facilitation of the widespread and ongoing violations of 18 U.S.C. §1591(a) at the property. Had Wyndham not continued participating in a venture that it knew or should have known was engaged in violations of 18 U.S.C. §1591(a), it would not have received a benefit from Jane Doe A.L.G.'s trafficking.

**VI.  Franchisee Defendants and the Staff at the Travelodge Hotel Acted as Actual Agents of Wyndham.**

83.     Wyndham is vicariously liable for the acts, omissions, and knowledge of Wyndham and staff at the Travelodge Hotel, which are Wyndham's actual agents or subagents.

84.     The Wyndham Defendants subjected Franchisee Defendants to detailed standards and requirements regarding the operation of the Travelodge Hotel through the franchising agreement, through detailed written policies and manuals, and through other formal and informal protocols, directives, mandates, and expectations imposed by the Wyndham Defendants.

85.     The Wyndham Defendants obscure the full extent of control they exercise over the franchisees by treating the manuals and certain policies as confidential and proprietary and prohibiting any public disclosure of those policies and manuals. Upon information and belief, the standards that the Wyndham Defendants imposed on the franchisees:

  a.  did not merely identify quality or outcome standards but instead specifically controlled the means, methods, and tools Franchisee Defendants used; and

  b.  covered virtually all aspects of hotel operations, including but not limited to personnel, building, grounds, furnishings, fixtures, decor, equipment, vehicles, supplies, foodstuffs, printed matters, and internal operating functions; and

  c.  dictated the specific manner in which Franchisee Defendants and hotel staff must carry out most day-to-day functions; and

  d.  significantly exceeded what was necessary for Wyndham to protect its registered trademarks.

86.     In addition to the ways described above, upon information and belief, Wyndham exercised and reserved the right to exercise systemic and pervasive control over Franchisee Defendants' day-to-day operation of the Travelodge Hotel, including the following ways:

  a.  Wyndham required franchisees and management of the franchised hotel to participate in mandatory training programs, both during onboarding and on an ongoing basis. This training covered all aspects of hotel operations, including aspects of hotel operations that go significantly beyond what would be necessary for Wyndham to protect its registered trademarks;

b.  Wyndham maintained a team of regionally based trainers to provide training at branded hotels. Wyndham provided training for hotel management and select hotel staff on-site and at locations selected by Wyndham;

c.  Wyndham provided hotels staff with training it created through an online learning platform, Wyndham University, it controlled and maintained, including training specific to hotel-based jobs, such as safety and security training for housekeeping staff and safety and security training for the front desk;

d.  Wyndham controlled training provided by franchisees to hotel staff by dictating the content of that training, providing required content for that training, and dictating the training methods used;

e.  Wyndham retained sole discretion to determine whether all training had been completed satisfactorily;

f.  Wyndham maintained oversight in hiring, disciplining, and terminating hotel management and employees;

g.  Wyndham required franchisees to participate in mandatory centralized services for day-to-day operation of the hotel;

h.  For certain products and services that franchisee was required to purchase to operate the property, Wyndham designated approved vendors and prohibited franchisee from purchasing goods and services from anyone other than an approved vendor;

i.  Wyndham required franchisees to use its revenue management system, through which it dictated pricing and strategies to maximize revenue, and which gave it direct ability to supervise day-to-day operations at through the hotel through direct access to the system;

j.  Wyndham set required staffing levels for the Travelodge Hotel;

k.  Wyndham established detailed job descriptions for all positions in its branded properties and drafted numerous, detailed policies that referenced these positions and dictated which positions must perform which tasks and how they must do so;

l.  Wyndham set requirements for the hiring process used by franchisees and oversaw employee discipline processes and termination decisions;

m.  Wyndham provided benefits for employees of franchised hotels;

n.  Wyndham controlled channels for guests to report complaints or provide feedback regarding the subject properties and directly participated in the response and/or supervised and the response to customer complaints or other feedback. Wyndham

retained the right to provide refunds or other compensation to guests and to require Franchisee Defendants to pay associated costs;

o.  Wyndham generated reports and analysis of guest complaints and online reviews for the Travelodge Hotel;

p.  Wyndham set detailed requirements for insurance that Franchisee Defendants must purchase;

q.  Wyndham exercised or retained control over the Franchisee Defendants' day-to-day accounting and banking practices;

r.  Wyndham regularly audited the books and records of Franchisee Defendants;

s.  Wyndham conducted frequent and unscheduled inspections of the Travelodge Hotel;

t.  Wyndham retained the right to issue fines, require additional training, to impose and supervise implementation of detailed corrective action plans, and to take other steps up to and including termination of the franchising agreement if franchisee violated any of Wyndham's detailed rules, expectations, protocols, or policies, including those that governed day-to-day operations of the Travelodge Hotel;

u.  Wyndham controlled all marketing for the Travelodge Hotel, directly provided marketing services, and prohibited Franchisee Defendants from maintaining any online presence unless specifically reviewed and approved by Wyndham;

v.  Wyndham exercised or retained control over all aspects of building and facility design;

w.  Wyndham imposed detailed recordkeeping and reporting requirements on Franchisee Defendants regarding virtually all aspects of hotel operations;

x.  Wyndham supervised and controlled day-to-day operations of the Travelodge Hotel through detailed information and extensive reports that it obtained through the property management system and other software systems it required Franchisee Defendants to use;

y.  Wyndham required the franchisee and hotel staff to implement a data system that gives Franchisor real-time information that it can monitor on a day-to-day basis; and

z.  Wyndham retained the virtually unlimited right to revise policies or adopt new requirements for the day-to-day aspects of hotel operations.

87. Upon information and belief, Wyndham had the right to and did enforce its control over Franchisee Defendants through various methods, including:

    a.  the right to conduct detailed inspections of the Travelodge Hotel;

    b.  monitoring or auditing the Franchisee Defendants for compliance with policies and expectations;

    c.  directing Franchisee Defendants to take specific steps to come into compliance with detailed and exacting standards regarding day-to-day operations;

    d.  mandating training and education for franchisee and/or hotel staff;

    e.  employing consultants or field agents to become involved in the day-to-day operations of franchised hotels;

    f.  the right to impose fines or penalties;

    g.  the right to impose additional conditions on franchisee or to restrict or limit its right to provide goods and services; and

88. the right to terminate the franchise agreement for failure to comply with policies that govern the means and methods used for day-to-day operations.

## VII.    Wyndham Defendants are jointly responsible for the trafficking of Jane Doe (A.L.G.)

89. All the Wyndham Defendants were participants in a joint venture, which involved a common enterprise, profit-sharing, a community of interests, and joint rights of control and management, and are vicariously liable for the violations of the other participants in the joint venture.

90. Upon information and belief, operation of the Travelodge Hotel was part of a single unified operation by Wyndham Defendants. Upon information and belief, all Wyndham Defendants shared a common parent company, were subject to joint control, and operated as an integrated enterprise and/or as alter-egos. Upon information and belief, Wyndham Defendants acted jointly to own, operate, control, manage, and supervise the Travelodge Hotel. As an

integrated enterprise and/or joint venture, Defendants were separately and jointly responsible for compliance with all applicable laws.

**VIII.    Defendants are Jointly and Severally Liable for Jane Doe (A.L.G.)'s Damages.**

91.    The venture or ventures in which each Defendant participated were direct, producing, and proximate causes of the injuries and damages to Jane Doe (A.L.G.).

92.    Under the TVPRA, Defendants are jointly and severally liable for all damages that a jury awards to Jane Doe (A.L.G.) for past and future losses she suffered as a proximate result of her sexual exploitation and trafficking.

<u>**CAUSES OF ACTION—SEX TRAFFICKING UNDER THE TVPRA**</u>

93.    Jane Doe (A.L.G.) incorporates all other allegations.

**I.    Cause of Action: Perpetrator liability under 18 U.S.C §1595(a) based on violation of 18 U.S.C §1591(a) (Franchisee Defendants)**

94.    Jane Doe (A.L.G.) is a victim of sex trafficking within the meaning of § 1591 and 1595(a) and is thus entitled to bring a civil action under 18 U.S.C §1595(a) against the "perpetrator" of any violation of the TVPRA.

95.    Franchisee Defendants are perpetrators within the meaning of 18 U.S.C §1595(a) because they:

      a.    violated 18 U.S.C §1591(a)(1) when, through the acts and omissions described throughout this Complaint, they harbored individuals (including Jane Doe (A.L.G.)) knowing or in reckless disregard of the fact that the victims would be caused, through force, coercion, or fraud, to engage in commercial sex acts while at their respective hotel properties.

      b.    violated 18 U.S.C §1591(a)(2) when, through the acts and omissions described throughout this Complaint, they knowingly received financial benefit by knowingly assisting, supporting, or facilitating a venture that was engaged in violations under 18 U.S.C §1591(a)(1) at their respective hotel properties.

96.    Violations of 18 U.S.C §1595(a) by each of the Franchisee Defendants as "perpetrators" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (A.L.G.) to suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel property.

II.    **Cause of Action: Beneficiary Liability under §1595 (a) of the TVPRA (all Defendants).**

97.    Jane Doe (A.L.G.) is a victim of sex trafficking within the meaning of 18 U.S.C §§ 1591 and 1595(a) and is thus entitled to bring a civil action under the "beneficiary" theory in 18 U.S.C §1595(a) against anyone who knowingly benefited from participation in a venture that the person knew or should have, with reasonable diligence, known was engaged in a violation of the TVPRA.

98.    Through acts and omissions described throughout this Complaint, Defendants received a financial benefit from participating in a venture with traffickers, including Jane Doe (A.L.G.)'s traffickers, despite the fact that each defendant knew or should have known that these traffickers, including Jane Doe (A.L.G.)'s traffickers, were engaged in violations of 18 U.S.C §1591(a)(1) and 18 U.S.C §1591(a)(2). Thus, Defendants are liable as a beneficiary under 18 U.S.C §1595(a).

99.    Through the acts and omissions described throughout this Complaint, Wyndham Defendants received a financial benefit from participating in a venture with its respective franchisees regarding the operation of its respective hotel property despite the fact that Wyndham Defendants knew or should have known that this venture was violating 18 U.S.C §§ 1591(a) and 1595(a).

100.    Violations of 18 U.S.C §1595(a) by Defendants as "beneficiaries" operated, jointly, with other unlawful acts and omissions alleged in this Complaint, to cause Jane Doe (A.L.G.) to

suffer substantial physical and psychological injuries and other damages because of being trafficked and sexually exploited at the Defendants' hotel properties.

**III.    Cause of Action: Vicarious Liability for TVPRA Violations (Wyndham Defendants).**

101.    Under the TVPRA and the federal common law, each member of a joint venture is vicariously liable for the acts and omissions of all other members of that joint venture.

102.    Under the TVPRA and the federal common law, an entity vicariously liable for the acts and omissions of its alter-egos.

103.    Franchisee Defendants acted as the actual agents of Wyndham Defendants when operating its respective hotel property.

104.    Through the acts and omissions described throughout this Complaint, Wyndham Defendants exercised or retained the right to exercise systematic and day-to-day control over the means and methods used by its franchisee to operate its hotel property.

105.    Wyndham Defendants are vicariously liable for the TVPRA violations of its franchisee and the subagents of that franchisee.

106.    Additionally, on information and belief, each of the Wyndham Defendants participated in a joint venture. They had highly integrated operations at the hotels, shared revenue and profits generated from the hotels, and exercised mutual control over the venture at the hotels. They functioned as a single integrated entity and/or as alter-egos of one another.

<u>**TOLLING OF LIMITATIONS**</u>

107.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (A.L.G.) invokes the discovery rule. At the time she was harmed and through at least 2017, Jane Doe (A.L.G.) was under coercion and control of traffickers who abused and manipulated her. Thus, Jane Doe (A.L.G.) did not discover and could not reasonably have discovered the legal cause of

her injury more than ten years before she filed this lawsuit. While she was under the control of her traffickers, Jane Doe (A.L.G.) —through no fault of her own—lacked the information to bring a claim because she did not know both her injury and the cause of her injury. This lack of information was a direct result of A.L.G.  being kept under the control of her traffickers, which Defendants facilitated.

108.    At the time Jane Doe (A.L.G.) was harmed, she did not know that she was the victim of human trafficking as that term is defined by law, that her injury arose from being trafficked at Defendants' hotel or that she was a person trafficked, much less that she was being victimized by a human trafficking venture, and she did not discover and was not in a position to discover the legal cause of her injury, more than ten years before suit was filed.

109.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (A.L.G.) invokes the doctrine of equitable tolling because, as a result of being a victim of trafficking, Jane Doe (A.L.G.) faced extraordinary circumstances, which arose through no fault of her own, that prevented her from filing a lawsuit, and those circumstances did not end more than 10 years before Jane Doe (A.L.G.) filed this lawsuit.

110.    As a result of her continuous trafficking at the Travelodge Hotel through at least 2017, Jane Doe (A.L.G.) was beaten, drugged, sexually assaulted, and mentally abused. She lacked the mental capacity to recognize the extent and scope of her injuries or those responsible particularly those who financially benefited from her trafficking but may not have been seen to be directly involved.

111.    Jane Doe (A.L.G.) was under the continuous control of her traffickers through at least 2017. As a result, she did not have the freedom to investigate her claims, to identify those responsible or to seek legal representation necessary to pursue her legal rights.

112.    To the extent Defendants assert an affirmative defense of limitations, Jane Doe (A.L.G.) also invokes the continuing tort doctrine because this lawsuit arises out of a pattern of continuous and ongoing tortious conduct.

113.    Jane Doe (A.L.G.) was subject to continuous trafficking at the Travelodge Hotel through at least March 2014, which is not more than 10 years before Jane Doe (A.L.G.) filed this lawsuit.

114.    This continuous trafficking resulted from Defendants' continuous facilitating of trafficking at the Travelodge Hotel and Defendants' ongoing venture with one another and with criminal traffickers.

## **DAMAGES**

115.    Defendants' acts and omissions, individually and collectively, caused Jane Doe (A.L.G.) to sustain legal damages.

116.    Defendants are joint and severally liable for all past and future damages sustained by Jane Doe (A.L.G.).

117.    Jane Doe (A.L.G.) is entitled to be compensated for personal injuries and economic damages, including:

   a.  Actual damages (until trial and in the future)

   b.  Incidental and consequential damages (until trial and in the future);

   c.  Mental anguish and emotional distress damages (until trial and in the future);

   d.  Lost earnings and lost earning capacity (until trial and in the future);

   e.  Necessary medical expenses (until trial and in the future);

   f.  Life care expenses (until trial and in the future);

   g.  Physical pain and suffering (until trial and in the future);

h.  Physical impairment (until trial and in the future);

i.  Exemplary/Punitive damages;

j.  Attorneys' fees; and

k.  Costs of this action.

l.  Pre-judgment and all other interest recoverable.

## JURY TRIAL

118.    Jane Doe (A.L.G.) demands a jury trial on all issues.

## RELIEF SOUGHT

119.    WHEREFORE, Jane Doe (A.L.G.) prays that this case be set for trial before a jury and that, upon a final hearing of the cause, judgment be entered for Jane Doe (A.L.G.) against all Defendants jointly and severally for the actual, compensatory, and punitive damages as the evidence may show, and the jury may determine to be proper, together with the costs of suit, prejudgment interest, post-judgment interest, and such other and further relief to which Jane Doe (A.L.G.) may, in law or in equity, show herself to be justly entitled.

Respectfully submitted,
**PROVOST ⋆ UMPHREY LAW FIRM, L.L.P.**

**By:**  /s/ *Bryan O. Blevins, Jr.*
Bryan O. Blevins, Jr. | SBN 02487300
Colin D. Moore | SBN 24041513
Ashlynn K. Alexander | SBN 24137302
350 Pine Street, Ste. 1100
Beaumont, TX 77701
(409) 835-6000 Telephone
bblevins@pulf.com
cmoore@pulf.com
aalexander@pulf.com